# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50108 | **DATE** | 4/1/2005 |
| **CASE TITLE** | Lewis vs. Barnhart | | |

**DOCKET ENTRY TEXT:**

For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. Defendant's Motion for Summary Judgement is granted. Plaintiff's Motion for Summary Judgment is denied.

■ [ For further detail see attached order.]

Notices mailed by judge's staff.

| | Courtroom Deputy Initials: | BB/AM |
|---|---|---|

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| **ANDREW C. LEWIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 04 C 50108** |
| | ) | |
| **v.** | ) | **Magistrate Judge** |
| | ) | **P. Michael Mahoney** |
| **JOANNE B. BARNHART,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Andrew C. Lewis ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on May 20, 2004. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for SSI on October 2, 2002 (Tr. 104), and his application for benefits was denied on January 14, 2002. (Tr. 58). Plaintiff filed a request for reconsideration on February 4, 2002, and was subsequently denied reconsideration on April 5, 2002. (Tr. 62, 64). Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on May 6, 2002. (Tr. 68). Plaintiff appeared with a Representative before an ALJ on July 15, 2003. (Tr. 23). In a

decision dated October 27, 2003, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 13-22). The Appeals Council denied Plaintiff's request for review on January 29, 2004. (Tr. 8).

## II. FACTS

Plaintiff was born on January 29, 1957, making him forty-six years of age at the time of his July 15, 2003, hearing before the ALJ. (Tr. 50). Plaintiff completed one year of high school (Tr. 29). At the time of his hearing, Plaintiff lived with his sister and her husband in their home (Tr. 27). Plaintiff claims disability since September 22, 2001, due to HIV/AIDS, schizophrenia, and a bad back. (Tr. 29, 104).

Plaintiff had no reported income since October, 2001. (Tr. 105). From August, 2001, until September, 2001, Plaintiff worked for Super Suds Car Care Center as a car attendant/detailer. (Tr. 176-77). This position was full-time. (*Id.*). Plaintiff duties included cleaning the inside and outside of cars. (Tr. 181). Plaintiff stated he was fired from Super Suds Car Care Center because he was unable to work outside in cold weather. (Tr. 29). The position paid Plaintiff five dollars and seventy-five cents per hour for his services. (Tr. 180).

From February, 2001, to July, 2001, Plaintiff worked for temporary work services on a sporadic basis. (Tr. 185-86). It is unclear from the record exactly how many hours Plaintiff worked during this period or the complete details of the work done. Plaintiff did injure his ankle during a roofing placement. (Tr. 369-70). From October, 2000, to January, 2001, Plaintiff worked at Anderson Dodge as a automobile detailer. (Tr. 202, 206). The position was full-time and for his services Plaintiff was paid seven dollars and fifty cents. (Tr. 202). Plaintiff was

terminated from his position. (Tr. 206). The Department of Rehabilitation Services (DORS) reported that Plaintiff was fired due to a bad temper. (Tr. 164).

From August, 2000, to October, 2000, Plaintiff worked for Rock River Motors as an automobile detailer. (Tr. 212, 218). Plaintiff was paid according to the number of cars he detailed. (Tr. 219). Due to a lack of hours Plaintiff resigned from his position. (Tr. 218). From May, 2000, to July, 2000, Plaintiff worked for Illinois Growth Enterprises Workshop as an assembler. (Tr. 226, 241, 244). Plaintiff worked full-time. (*Id.*). When asked by the ALJ, Plaintiff reported that he was fired because he worked too slowly. (Tr. 41). However, according to DORS, Plaintiff was terminated from his position at the workshop after an altercation on the job site where Plaintiff was unable to control his temper and the police were called. (Tr. 231-32).

Plaintiff did assembly work at Illinois Growth Enterprises, from 1983 to 1985. (Tr. 329). From 1976 to 1978, Plaintiff worked at Gates Rubber Company as a lay pipe bender and at Mattison Foundry from 1975 to 1976. (*Id.*). Plaintiff worked at Frontier Ford as an automobile detailer from 1972 to 1974. (*Id.*).

Plaintiff described his typical day since filing for disability as beginning in the morning, when he would wash his face and make his own breakfast. (Tr. 38). Then, Plaintiff usually spent the entire day watching television and sitting in the easy chair. (*Id.*). While his sister usually made dinner when she arrived home from work, Plaintiff stated that he made his own lunch. (*Id.*). When asked about household chores, Plaintiff stated he does not clean around the house, do laundry or yard work. (*Id.*). Plaintiff does bathe and dress himself. (*Id.*). Plaintiff also reported doing some of the grocery shopping. (*Id.*). As for going out socially, Plaintiff stated that he does not go out, nor do friends and family visit him. (*Id.*). Plaintiff stated that he

does go to the library once a month to get books to read, like "Black Beauty" and "Moby Dick." Every Sunday, Plaintiff reported that he attends church services for two hours. (Tr. 39-40). Plaintiff also reported that he walks three miles in the park for exercise. (Tr. 144).

However, there is some conflicting evidence in the record as to Plaintiff's daily activities. In a psychological evaluation, Plaintiff told Dr. Peggau that he mops and vacuums the floors and he also does laundry. (Tr. 294.). Plaintiff also reported that his other chores included keeping the house clean and taking out the garbage. (*Id.*). When asked whether or not he goes out socially, Plaintiff reported to Dr. Peggau that he had some acquaintances with whom he has contact about twice per month. (*Id.*).

At the time of Plaintiff's hearing, Plaintiff did not have a driver's license. (Tr. 28). To attend medical appointments and run errands Plaintiff has a bus pass that he uses. (Tr. 28-29).

When questioned by the ALJ, Plaintiff reported that he did not think he could return to work because he was in so much pain that it feels like his "right arm is about to fall off." (Tr. 30). Plaintiff further stated that his doctor cannot do anything for the pain because he does not have money to buy pain medication. (Tr. 32). Plaintiff also reported that he cannot afford to buy blood pressure medications. (Tr. 62). Plaintiff did state, however, that the Crusader Clinic supplied him with all his other medications. (Tr. 33). Plaintiff obtained psychiatric treatment with Crusader Clinic in Rockford, where he meets once a month with a psychiatrist. (*Id.*). Plaintiff reported other reasons for his inability to work, such as night sweats, nausea, and general weakness. (*Id.*). When asked by the ALJ, Plaintiff reported that his doctor did not inform him that it was okay for him to work. (Tr. 31).

At the time of the Plaintiff's hearing, he took Effexor XR, Vasotec, and Geodon for his schizophrenia. (Tr. 33-34 and 261-63). With the medications, Plaintiff reported to the ALJ

4

hearing voices once or twice a week. (Tr. 37). Plaintiff also reported to the ALJ that he takes medications for the treatment of his HIV/AIDS including Crixivan, SHZ-TMP DS, Endomethiacin, Adix Nizatidine, and Combivir. (Tr. 32-33 and 261-63). Plaintiff also reported taking Triamcinolone for lesions and scarring, Naproxen for pain, and two calcium supplements. (Tr. 261-63). Plaintiff reported no side effects from any of his medications. (Tr. 37). When asked by the ALJ, Plaintiff opined that he could stand for a few minutes and sit for a couple of hours. (*Id.*). When asked about his use of alcohol and drugs, Plaintiff reported that he has not had an alcoholic beverage for several years. (Tr. 38). Plaintiff also denied any use or history of use of illegal drugs. (Tr. 38). However, in a psychological assessment conducted by Dr. Mark B. Langgut, Plaintiff admitted to past use of cocaine. (Tr. 335).

Vocational expert, Ms. Susan Entenberg, testifying before the ALJ, stated that Plaintiff's past work as a car wash attendant and a detailer was classified as light and unskilled work. (Tr. 50). The ALJ then asked Ms. Entenberg whether a hypothetical individual who has the following characteristics, could perform Plaintiff's past work:

> 46 years old, has the work experience and education of this
> claimant and has the following exertional limitations, could sit for
> six hours, stand and walk for at least six hours, lift and carry
> frequently up to 10 pounds, occasionally up to 20 pounds.

(*Id.*).

Ms. Entenberg testified that such an individual could do Plaintiff's past jobs that were classified as light and unskilled work. (*Id.*). The ALJ then added the requirement that the individual had to avoid concentrated exposure to the extreme cold. (*Id.*). The vocational expert stated the additional requirement would eliminate the car wash attendant job, but would not affect the job as a detailer because that type of work is generally done indoors. (Tr. 50-51). Ms. Entenberg stated that even with the additional requirements, the individual would be able to

work as a packer (10,000 jobs in the nine county northeastern Illinois area), assembler (20,000 jobs), and light housekeeper (20,000 jobs). (Tr. 51). The ALJ then further restricted the hypothetical to jobs that were low to moderate stress, and jobs with no regular general public contact. (*Id.*). Ms. Entenberg responded that the same jobs would still be available. (*Id.*). Plaintiff's representative then added a requirement to the ALJ's hypothetical whereby the individual could not understand or carry out simple instructions. (Tr. 53-54). Ms. Entenberg indicated that the individual would not be able to perform unskilled work. (Tr. 54).

## III. **MEDICAL HISTORY**

### A. **Psychological History**

Plaintiff's earliest psychiatric records before this court are treatment records which pre-date Plaintiff's alleged disability onset date of September 22, 2001, by several years. The first of these records is a progress note and an initial history report from the Janet Wattles Center from December 15, 1981, and May 11, 1982, respectively. (Tr. 318-22). Plaintiff's records contain reports stating that Plaintiff thought the sun and moon followed him and were ruining his life. (*Id.*). Plaintiff also reported that he wanted to obtain Social Security disability, because of his problem with the sun and moon following him. (*Id.*). The progress note reported that Plaintiff's diagnosis was schizophrenia, paranoid-type. (Tr. 318). On December 11, 1985, the Janet Wattles Center closed Plaintiff's case due to his non-responsiveness. (Tr. 322).

On December 21, 1999, Plaintiff was referred to the Common Boundary Wellness Center by a Rehabilitation Counselor, with the Office of Rehabilitation Services (ORS), for a psychological assessment in order to assist with eligibility determination. (Tr. 323). At this time, Plaintiff did not report a history of mental illness to his examiner. (Tr. 324). However,

records received from ORS did state that Plaintiff had a history of treatment through Janet

Wattles for "psychosis". (*Id.*). Examiner noted "no signs of psychosis were evident, and he

denied experiencing hallucinations or delusions." Plaintiff told the examiner that he was

planning on applying for "SSI and SSDI." (*Id.*). Cognitive tests done by the examiner put

Plaintiff in the "Low Average" range. (Tr. 326). Examiner also noted that Plaintiff "appears to

be suffering from a state of depression." (*Id.*).

On June 9, 2000, Plaintiff was seen by Dr. Mark B. Langgut, a licensed clinical

psychologist, to assist in the determination of Plaintiff's social security disability status and

eligibility. (Tr. 334). In his report, Dr. Langgut wrote that Plaintiff "stated that in 1995 he drank

beer and used cocaine but that he stopped using substances due to his impaired health." (Tr.

335). Dr. Langgut tested Plaintiff's cognitive abilities. (Tr. 336). When questioned by the

examiner, Plaintiff indicated that he was able to remember one digit forward. (*Id.*). For

example, when the examiner asked him to repeat 5, 9, 1, Plaintiff replied, "3, 2, 4." (*Id.*). When

asked to repeat 3, 5, 9, he replied "3, 2, 5." (*Id.*). When asked to repeat 1, 7, he replied, "6, 7."

(*Id.*). Dr. Langgut in his report noted:

> [t]his finding is highly unusual and may be representative of psychological
> issues and concerns unrelated to memory per se. In contrast, the claimant's
> short-term memory functioning was intact as he recalled an item from the
> previous day's news and what he had eaten for dinner the previous evening.
> His recall of directions taken to the testing site was adequate as well, casting
> further doubt on the credibility of his lack of immediate memory skill.

(*Id.*).

When Plaintiff was asked questions about what he would do if he found an envelope that was

sealed, addressed, and had a new stamp on it, he responded "put it in the garbage." (Tr. 337).

When asked what he would do if he were the first person to see fire and smoke in a crowded

movie theater, Plaintiff replied, "leave the building." (*Id.*). The examiner noted that "these

7

responses indicated that the claimant has impaired judgment and also appears to be somewhat invested in a negativistic or oppositional style that may be somewhat disingenuous as well." (*Id.*). Also according to Plaintiff's test scores, Dr. Langgut noted that Plaintiff "is essentially illiterate" and has extremely limited functioning in the area of arithmetic. (Tr. 338). Dr. Langgut's diagnosis was schizophrenia (undifferentiated and in partial remission) and polysubstance abuse (in remission). (*Id.*). Dr. Langgut further opined that although Plaintiff "presented himself as having a mentally deficient intellectual ability, his reports of adequate adaptive ability essentially does not allow for the formal diagnosis of Mental Retardation." (*Id.*).

On November 30, 2001, a state agency psychiatrist reviewed Plaintiff's medical records. (Tr. 296-309). The psychiatrist opined that Plaintiff did not have severe mental impairments. (Tr. 296). The psychiatrist then examined the Plaintiff to determine if he had any of the following functional limitations: 1) restriction of activities of daily living, or 2) difficulties in maintaining social functioning, 3) difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace, and 4) episodes of decompensation, each of extended duration. (Tr. 306). The psychiatrist determined that Plaintiff had *no* restriction*s* of daily living; *no* difficulties in maintaining social functioning; *mild* difficulties in maintaining concentration, and *no* episodes of decompensation, of extended duration. (*Id.*). A state agency psychologist affirmed the psychiatrist's opinion on March 25, 2002. (Tr. 296).

On November 15, 2001, Plaintiff had a psychological assessment performed by John Peggau, Psy. D. (Tr. 293). Plaintiff told Dr. Peggau that he used to drink alcohol many years ago but quit because he thought he was having liver problems. (*Id.*). Plaintiff denied any history of drug use or abuse. (*Id.*). Plaintiff told Dr. Peggau that "my whole left side feels like it is going paralyzed and I can hardly walk on my left leg." (*Id.*). Dr. Peggau noted that Plaintiff was

able to walk with crutches and that he did not seem to rely very heavily on the crutches but did have a mild limp. (Tr. 294). Plaintiff favored his left leg. (*Id.*). Dr. Peggau conducted a Digit Span task and Plaintiff was able to recall five digits forward and three backward. (*Id.*). Dr. Peggau also noted that Plaintiff had good calculation and arithmetic skills. (*Id.*). Plaintiff knew that if he found an envelope in the street, which was sealed, addressed, and had a new stamp, that he should put it in the mailbox. (Tr. 294-95). Additionally Plaintiff knew that if he was the first person to notice a fire while in the theater he should "tell people in the lounge area." (Tr. 295). Dr. Peggau opined that Plaintiff was of fairly average intellectual functioning and should be able to work with co-workers, supervisors, and the public. (*Id.*).

On May 30, 2002, Plaintiff went to the Crusader Clinic to obtain an EKG because of Dr. Rizvi's recommendation that Plaintiff should be started on Geodon for his schizo-affecting disorder. (Tr. 363). On June 27, 2002, Plaintiff reported to Dr. Rizvi that he was hearing voices telling him to kill himself and that he had not heard the voices in the past month. (Tr. 362). On August 22, 2002, Plaintiff again visited Dr. Rizvi. (Tr. 357). Plaintiff reported that he was not sleeping well and was getting up between five and six times during the night to go to the bathroom because his bladder was weak. (*Id.*). Plaintiff wanted to be put on Valium. (*Id.*). Plaintiff also reported that he still heard voices, so Dr. Rizvi continued his medications of Geodon and Effexor. (*Id.*).

According to the record, Plaintiff's next visit to Dr. Rizvi was on January 9, 2003. (Tr. 422). As noted by Dr. Rizvi, Plaintiff was sleeping well and had not heard voices in a month. (*Id.*). Plaintiff stated that he wanted to live on his own, and he was applying for disability. (*Id.*). Dr. Rizvi continued Plaintiff on Geodon and Effexor. (*Id.*).

**B. General Medical History**

Plaintiff's earliest general medical records before this court are treatment records which pre-date Plaintiff's alleged disability onset date of September 22, 2001. The first of these records is a progress report from August 31, 1999, when Plaintiff was seen at Crusader Clinic. (Tr. 391). At the time, Plaintiff was diagnosed as having HIV/AIDS and Plaintiff reported experiencing chest pains, night sweats, and a fever to Dr. Ali. (*Id.*). Dr. Ali noted in his report that Plaintiff's HIV was stable. (*Id.*).

From December, 1999, to September, 2000, Plaintiff was seen on a monthly or bimonthly basis at the Crusader Clinic to have a follow-up for his HIV/AIDS, hypertension, and hypertrophic scar.[1] At the appointments, Plaintiff had his blood pressure[2] and viral load (amount of HIV virus in the blood) checked and medications refilled if necessary. (Tr. 283, 389-90, 373-76). During this time it was noted that Plaintiff's HIV/AIDS was stable, Plaintiff was compliant with medications, and had no other complaints. (*Id.*).

On September 27, 2000, Plaintiff, reported to Dr. Ali that he twisted his right leg, causing pain in his right ankle. (Tr. 373). Plaintiff was able to ambulate with a cane. (*Id.*). Dr. Ali noted that the ankle showed no visible swelling, that movements were full range, but somewhat painful. (*Id.*). Plaintiff was diagnosed with a right ankle sprain, given a seven day supply of Naproxen Sodium, and advised to use moist heat. (*Id.*).

Plaintiff was next seen by Dr. Ali on April 11, 2001. (Tr. 372). Plaintiff's HIV/AIDS was stable and he was doing well. (*Id.*). Plaintiff had no complaints. (*Id.*).

On May 2, 2001, Plaintiff was seen at the emergency room of Swedish American

---

[1] The scar is thought to be from a previous herpes infection. (Tr. 389).

[2] Plaintiff has a history of hypertension. (Tr. 390).

Hospital complaining of left flank pain. (Tr. 339-55). Plaintiff was diagnosed with renal colic and a urinary tract infection. (Tr. 371). Plaintiff was discharged and given Bactrim and Vicodin as needed for pain and instructed to drink plenty of fluids. (*Id.*). A CAT scan was done that did not show a stone, but did show hydronephrosis and hydroureter which are possibly secondary to urethral calculus. (*Id.*). Plaintiff followed up with Dr. Ali on May 8, 2001. (*Id.*).

Plaintiff was examined by Dr. Ali on June 19, 2001, due to a roofing accident that occurred during the second week of June where Plaintiff's foot went through two iron bars. (Tr. 370). Plaintiff complained of pain in the right ankle and was unable to put any weight on the ankle. (*Id.*). Plaintiff was walking with the use of crutches. (*Id.*). Plaintiff wanted a letter for work that stated that he could not work and a Workman's Compensation recommendation. (*Id.*). Dr. Ali noted that the right ankle was swollen, and movements of the ankle were full range with some pain of the extremes. (*Id.*). Dr. Ali sent Plaintiff for x-rays at Swedish American and gave him naproxen sodium and advised hot soaks. (*Id.*). Lab results from Swedish American reported soft tissue swelling and changes involving the medial malleoulus, probably secondary to old trauma. (Tr. 406). Plaintiff followed-up with Dr. Ali on July 12, 2001, still complaining of ankle pain and stated that he could not work. (Tr. 369). Plaintiff requested a note for work stating that he could not go back to work until next month. (*Id.*). Dr. Ali noted no swelling of the ankle and told Plaintiff that there was no fracture or dislocation, so he could not give Plaintiff a note to be off work. (*Id.*). Dr. Ali gave Plaintiff some Ultram and told him that he would write a note for light duty, but Plaintiff refused that note. (*Id.*).

On August 14, 2001, Plaintiff was seen by Dr. Ali due to complaints of right-sided chest

pain. (Tr. 368). Dr. Ali noted unclear etiology of the chest pain and opined that it may be muscoloskeletal in origin. (*Id.*). Dr. Ali also noted that Plaintiff's HIV/AIDS was well suppressed and gave him a two week supply of Ultram. (*Id.*).

On October 2, 2001, Plaintiff was given a note from Crusader Clinic that stated that Plaintiff was unable to work outside in weather below fifty degrees due to his immune response. (Tr. 175). Dr. Ali noted that Plaintiff was compliant with medications. (Tr. 367).

Plaintiff was next seen by Dr. Kamara on February 12, 2002, complaining of chronic generalized pain, which he stated started when he was diagnosed with HIV. (Tr. 366). Dr. Kamara was not sure what Plaintiff considered to be the cause of his pain. (*Id.*). Dr. Kamara did note a hypertrophic scar on Plaintiff's back and started him on Ultram. (*Id.*).

Plaintiff met with Dr. Kamara on March 12, 2002, to request a letter so that he could apply for disability. (Tr. 365). Dr. Kamara requested that the Plaintiff complete a release of information form, but noted that at this point, Plaintiff "does not seem to have any underlying disabling disease." (*Id.*).

On March 14, 2002, Plaintiff requested that Dr. Kamara write a letter to the Social Security Office explaining that he has been out of work for a year and that he needs to be back on Social Security disability benefits. (Tr. 364). Dr. Kamara explained to Plaintiff that he could not verify that Plaintiff has not been at work. (*Id.*). Rather, Dr. Kamara suggested that he could write a letter stating that Plaintiff was at the clinic multiple times, but in his point of view there was no reason that Plaintiff could not obtain employment. (*Id.*). Dr. Kamara noted that Plaintiff was "not quite pleased with this plan and states he will followup with me as needed." (*Id.*).

Plaintiff reported chest and shoulder discomfort to Dr. Kamara on July 2, 2002. (Tr.

12

361-62). Dr. Kamara prescribed Indomethacin for the chest pain, thought to be musculoskeletal in origin. (*Id.*). Dr. Kamara noted that Plaintiff's HIV/AIDS was poorly controlled. (*Id.*). Dr. Kamara opined that a possibility for the poor control was Plaintiff's difficulty with compliance with medications due to his psychiatric illness. (*Id.*). At an appointment on July 30, 2002, Plaintiff stated that he had been taking all of his medications. (Tr. 359). Plaintiff also reported that his chest discomfort had been resolved. (*Id.*).

On August 20, 2002, Plaintiff reported to Dr. Kamara for a follow-up appointment. (Tr. 358). Plaintiff reported compliance with all medications, stating that he had not missed any doses. (*Id.*). Dr. Kamara noted a low level of viremia[3] in Plaintiff. (*Id.*). On September 5, 2002, Plaintiff met with Dr. Kamara for a follow-up. (Tr. 356). Dr. Kamara noted an improvement in Plaintiff's CD4 count and decided to continue him on his current medications. (*Id.*).

Plaintiff next reported to the Crusader Clinic on January 13, 2003. (Tr. 421). Plaintiff complained of right shoulder pain. (*Id.*). Nurse Practitioner Yontz noted that Plaintiff's HIV/AIDS was currently suppressed. (*Id.*).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th

---

[3] The presence of a virus in the bloodstream. STEDMAN'S MEDICAL DICTIONARY 1938 (26th ed. 1995).

Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V. **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied Plaintiff's application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that

---

[4]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[5] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a

---

[5]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. §
404.1545(a). Although medical opinions bear strongly upon the determination of residual
functional capacity, they are not conclusive; the determination is left to the Commissioner, who
must resolve any discrepancies in the evidence and base a decision upon the record as a whole.
20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant
work is work previously performed by the claimant that constituted substantial gainful activity
and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security
Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant
work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional
capacity allows the claimant to engage in work found in significant numbers in the national
economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by
relying upon vocational expert testimony, or by showing that a claimant's residual functional
capacity, age, education, and work experience coincide exactly with a rule in the Medical-
Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2;
*Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume
3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary.
*Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that
sufficient work exists in the national economy that the claimant is qualified and able to perform,
then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI. ANALYSIS

The court will proceed through the five step analysis in order.

### A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One analysis, the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to the decision issued on October 27, 2003. (Tr. 22). The finding of the ALJ as to Step One of the analysis is not challenged by either party, and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the analysis is affirmed.

### B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two analysis, the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffers from HIV/AIDS and hypertension. (Tr. 14).

Evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party, and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the analysis is affirmed.

### C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, C.F.R. §404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 15). The ALJ found that although Plaintiff's diagnoses of schizophrenia (in remission) and major depressive disorder (single episode, mild) are supported by medical evidence, they do not appear to meet or equal Listings 12.03 or 12.04. (Tr. 15). While Plaintiff does demonstrate some of the symptoms required

18

under Section A of these Listings, he does not demonstrate a *marked* restriction of any of the activities under Section B of the Listings, nor does the Plaintiff's diagnosis meet or equal the requirements of Section C of the Listings.

The ALJ also found that Plaintiff's polysubstance abuse (in remission) does not meet or equal Listing 12.05. There is very little evidence of substance abuse in the record. As noted by the ALJ, Plaintiff admitted that he quit drinking alcohol to Dr. Langgut in June of 2000. (Tr. 335).

Plaintiff's mentally deficient intellectual functioning also does not meet or equal Listing 12.05. During a psychological assessment with Dr. Langgut on June 9, 2000, Plaintiff had his IQ tested, which resulted in a full scale IQ score of 58. (Tr. 337). While Listing 12.05 mandates a finding of disability for claimants with a valid IQ score at or below a 59, the record casts serious doubt as to the validity of Plaintiff's IQ score. For example, the ALJ referenced Dr. Langgut's psychological assessment of the Plaintiff that stated, although the Plaintiff's IQ score was a 58, Plaintiff's reports of adequate adaptive ability did not allow for a formal diagnosis of mental retardation. (Tr. 338). The ALJ also referenced Dr. Peggau's psychological assessment of the Plaintiff. (Tr. 295). Dr. Peggau noted that Plaintiff was able to carry out semi-complex instructions and showed fairly average intellectual functioning. (*Id.*). When asked by the ALJ, Plaintiff stated that he was able to read and write in English. (Tr. 29). This court finds that there is sufficient evidence in the record to cast doubt on the validity of the IQ test score and for the ALJ to find that the Plaintiff did not meet Listing 12.05.

Plaintiff's hypertension also does not meet or equal Listing 4.03. As noted by the ALJ, Plaintiff's hypertension lacks the presence of significant end organ damage or other

abnormalities as required to satisfy the Listings. (Tr.14). This court in examining the record, found no medical evidence to contradict this finding.

The real issue at Step Three is whether Plaintiff's HIV satisfies Listing 14.08. The findings of the ALJ at Step Three of the analysis are challenged by Plaintiff. Plaintiff urges this court to reverse the ALJ's decision because the ALJ should have viewed his impairments under Listing 14.08N. Listing 14.08N requires that the claimant have at least one of the following at a *marked* level: 1) restriction of activities of daily living, or 2) difficulties in maintaining social functioning, or 3) difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace or 4) episodes of decompensation, each of extended duration. The ALJ determined that Plaintiff had *no* restrictions of daily living; *moderate* difficulties in maintaining social functioning; *mild* difficulties in maintaining concentration, and *none* with respect to repeated episodes of decompensation, each of extended duration. (Tr. 15).

This court's own review of the record for substantial evidence supporting the ALJ's findings reveals several factors in favor of the ALJ's decision.[6] First, Plaintiff has admitted to a wide range of activities in which he engaged in on a regular basis, such as going to church every Sunday for two hours, taking three mile walks in the park, going to the library, visiting friends twice a week, and doing a wide range of household activities. (Tr. 38-40, 143-44). Second, Plaintiff's own treating physician, Dr. Kamara, told him on March 12, 2002, that he did not have a disabling disease. (Tr. 365). Dr. Kamara also told Plaintiff on May 14, 2002, that there was no reason why he could not obtain employment. (Tr. 364). Third, Plaintiff's mother testified that she thought he could work a job, but then he might quit. (Tr. 48). Therefore, since the record

---

[6] Plaintiff's specific attacks on the ALJ's credibility assessment and failure to call a medical expert are further addressed at Step Four.

does not support a different finding and Plaintiff does not meet the listed criteria of the 14.08(N), a further discussion of the 14.08N Listing was not required.

Lastly, the ALJ considered Plaintiff's combination of impairments and concluded that the level of severity did not equal that contemplated for any of the listed impairments in Appendix. (Tr. 14). The court finds no medical evidence in the record to contradict this finding by the ALJ.

Substantial evidence exists to support the ALJ's Step Three findings, and this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the analysis is affirmed.

## D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that the Plaintiff is unable to perform any of his past relevant work. (Tr. 19). Before doing so, the ALJ determined the Plaintiff's RFC. The RFC is what the claimant can still do despite his or her limitations. *See* 20 C.F.R. §416.945. In determining a Mental RFC, the first step of the procedure is to assess the nature and the extent of the Plaintiff's mental limitations and restrictions. 20 C.F.R. §416.945(c). In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time. 20 C.F.R. Ch III, Part 404, Subpart P. Appendix 1, 12.00(d). This information is then used to complete Plaintiff's vocational assessment. After considering the entire record, the ALJ found Plaintiff's RFC to preclude the following work related activities:

> lifting more than 20 pounds occasionally or more than 10 pounds
> frequently; performing jobs in relative extremes of cold;
> performing work involving more than low to moderate stress; and
> jobs with regular public contact.

(Tr. 16).

Using the RFC, the ALJ found that Plaintiff could not perform his prior work activities. Plaintiff does not challenge the ALJ's ultimate finding under Step Four, but does challenge the ALJ's RFC determination. First, Plaintiff argues that the ALJ made an improper credibility assessment. Second the Plaintiff asserts that the ALJ should have called a medical expert to testify at the hearing because the ALJ believed that Plaintiff's subjective complaints were not reasonably supported by medical evidence.

## A.      The ALJ's Credibility Assessment

Plaintiff disputes the ALJ's credibility assessment of Plaintiff. The ALJ stated that Plaintiff's allegations regarding symptoms and functional limitations are not fully credible. (Tr. 19). In support of this finding the ALJ stated:

> Also notable in judging the credibility of the claimant's allegations is the fact that although the claimant described daily activities that are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence...

(*Id.*)

Generally, a court will only reverse an ALJ's credibility determination if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). However, in evaluating credibility, the ALJ must follow her own regulations, including SSR 96-7p, which lists relevant considerations for evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." *See* SSR 96-7p. Thus, an ALJ's conclusion is afforded great deference so long as the court finds that the ALJ followed proper procedures in making his or her

determination. Even so, administrative law opinions are subject to harmless error review, such that every technical violation of the SSR does not equate to an automatic reversal or remand. *See Keys v. Barnhart*, 347 F.3d 990 (7th Cir. 2003).

In this case, the court finds that the ALJ's credibility determination was grounded in the record and adequately justified in the opinion. The ALJ specifically stated that Plaintiff's subjective complaints were not entirely credible, and then discussed the reasons for the disbelief, including the lack of objective evidence supporting Plaintiff's complaints. (Tr. 19).

Perhaps the most convincing reason why the ALJ's credibility determination should not be overturned is the methodical nature in which the ALJ addressed each of Plaintiff's alleged impairments individually, building a "logical bridge" to her ultimate conclusion that Plaintiff was not entirely credible. Beginning with Plaintiff's HIV/AIDS, the ALJ noted that the medical record showed that Plaintiff's condition was stable and under good control with medications. (Tr. 18). Plaintiff argues that his HIV/AIDS is not under control and that his cell count is dropping. (Pl's Mem., at 5). However, Plaintiff's argument is not supported by the medical record. Plaintiff's last medical visit, which is part of this record, occurred on January 13, 2003, and Nurse Practitioner Yontz reported that Plaintiff's HIV is currently suppressed. (Tr. 421). The ALJ also noted that the Plaintiff did not have side effects from his medications and had not been hospitalized or to the emergency room in the last two years. (*Id.*). Furthermore, the ALJ noted that Plaintiff's treatment was routine or conservative in nature, not the aggressive type one would expect for a disabled individual. (*Id.*).

The ALJ also addressed Plaintiff's mental impairments including his schizophrenia. (*Id.*). The ALJ noted that Plaintiff saw a psychiatrist once a month and that Plaintiff reported hearing

voices, which was not supported by the record. (*Id.*). Furthermore, the ALJ noted that although the Plaintiff alleged severe impairments, he was still able to go the library once a month, attend church service for two hours every Sunday and walk three miles in the park. (*Id.*). The record also showed that the Plaintiff lived on his own for four to five years. (*Id.*).

In addition to the evidence noted by the ALJ that casts doubt on the severity of each of Plaintiff's alleged impairments, the court also notes that not one of Plaintiff's physicians ever indicated that Plaintiff was disabled. Moreover, Plaintiff's own treating physician on May 14, 2002, indicated that there was no medical reason Plaintiff could not obtain employment. (Tr. 364). Given the ALJ's well supported decision for finding Plaintiff's complaints not entirely credible and Plaintiff's longitudinal medical record, this court finds the ALJ's conclusion that Plaintiff was not entirely credible to be reasonable and sufficiently explained. As such, the court finds no reason to reverse the ALJ's finding, nor to remand for a new credibility determination.

**B.     The ALJ's Failure to Call a Medical Expert at the Hearing**

Plaintiff disputes the ALJ's decision to not call a psychological or psychiatric expert at the hearing. Plaintiff specifically asserts that in order for the ALJ to make a finding that his subjective allegations were not supported by medical evidence, an expert was needed to provide an informed basis for the opinion. Plaintiff believes that the ALJ played doctor when the ALJ gave greater weight to Dr. Peggau's psychological assessment than Dr. Langgut. Plaintiff believes an expert was also needed to testify to Plaintiff's long and under-treated history of schizophrenia, Plaintiff's ability to appreciate and care for his schizophrenia, and Plaintiff's intellectual functioning abilties.

Defendant, to the contrary, asserts that the record contained sufficient information from several mental health professionals such that the ALJ was able to make an informed decision concerning Plaintiff's mental impairments and their effects on his ability to work. (Def.'s Mem., at 14). Defendant also states that the ALJ's RFC finding regarding Plaintiff's mental functioning was not only consistent with Dr. Peggau's report, but it contained even more restrictions that his report would suggest was necessary. (*Id.*). Moreover, the Defendant states that the ALJ could reasonably have discounted the evidence from Dr. Langgut's report, as it was contradicted by Dr. Peggau's more recent report which covered the relevant time period. (*Id.*).

An ALJ is required to summon a medical expert if one is necessary to provide an informed basis for determining whether the claimant is disabled. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). Additionally, the ALJ must sufficiently articulate his assessment of the evidence to assure that important evidence was considered. *See Hickman v. Apfel*, 187 F. 3d, 683, 689 (7th Cir. 1999).

This court finds Plaintiff's argument that an expert was needed to determine which psychological assessment (Dr. Langgut's or Dr. Peggau's) should have been given greater weight by the ALJ, to be unpersuasive. The court takes note that Dr. Langgut's psychological assessment of the Plaintiff was completed fifteen months before the date Plaintiff claims disability, while Dr. Peggau's assessment was completed within the period that Plaintiff's claims disability. Since Dr. Peggau's assessment is the most recent assessment in the record, the ALJ's decision to give it more weight was not without merit. Also Dr. Langgut's course of treatment was not consistent with what one would expect if the Plaintiff were truly disabled. (Tr. 18). The ALJ stated if the Plaintiff was truly disabled by his alleged impairments, one might expect to see more significant physical abnormalities. (*Id.*). The clinical and laboratory findings have not revealed abnormalities reasonably consistent with the Plaintiff's allegations of totally disabling symptoms. (*Id.*). Overall, this court finds that Dr. Peggau's psychological assessment was not

25

inconsistent with the record as a whole and that the ALJ did not need to summon a medical expert to make this determination.

The court also finds that the ALJ's decision to not summon an expert regarding Plaintiff's schizophrenia and mental capacity was justified. This court found no holes in the record, where the ALJ would have needed to call a medical expert. Moreover, there is no indication that another expert would have anything to add to Dr. Peggau's thorough findings. Rather, this court finds that the ALJ, after examining the medical evidence as a whole, reasonably made a decision to accept Dr. Peggau's report, and not Dr. Langgut's report. The physicians employed by the State Disability Determination Services agreed. (Tr. 18). Plaintiff's own treating physician, Dr. Kamara noted that Plaintiff did not have a disabling disease and could find no medical reason that Plaintiff could not obtain employment. (Tr. 364-65). After evaluating the combined evidence, the ALJ found that a medical expert was not needed as the record was sufficient to make a disability determination. This court agrees that a medical expert was not needed for the ALJ to make a disability determination.

In reviewing the record, this court has found substantial evidence to support the ALJ's findings at Step Four. Therefore, the ALJ's determination as to Step Four of the Analysis is affirmed.

## E. Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

The ALJ determined at Step Five that, based on Plaintiff's RFC, Plaintiff could perform a limited range of light work. (Tr. 20). Specifically, the ALJ found, according to evidence presented by the vocational expert, Susan Entenberg, that Plaintiff could perform the jobs of packer (10,000 jobs); assembler (20,000 jobs); and housekeeper (20,000 jobs). (*Id.*).

Overall, this court finds that the ALJ's RFC determination, the subject of Plaintiff's real disputes was affirmed by this court in Step Four. Neither party raises a specific challenge to the ALJ's findings as to Step Five. Accordingly, because substantial evidence exists to support the ALJ's finding, the court finds no reason to disturb it. The ALJ's determination as to Step Five of the analysis is affirmed.

## VII. CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the SSI determination process as outlined above. Commissioner's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 4/1/05